and thank you Mr. Kelley for coming up and talking with us. We want to be sure we understand these issues. Good afternoon, may it please the Court. It's my pleasure, Judge Newman. The issue before the Court today in this case is whether substantial evidence supports the Board's finding that Carroll teaches a reader that sends a bit-timing clock signal to a tag. Now the substantial evidence that supports that finding is Carroll's figures 4A and 4B that the Board referred to at pages 12 and 13 of its opinion. Now to take a step back and just go through how this technology works because it is a bit complicated, the technology claimed are RFID tags. These are identification tags that don't have their own power source and they're carried, for example, on an identification card or they can be used on livestock and they're used in conjunction with a reader. The reader emits an alternating magnetic field. When the tag enters the field of the reader, it electrifies internally. The reader's field causes electrons to move on an inductor inside the tag that serves as an antenna and the tag uses that alternating magnetic field and the subsequent creation of electron flow to Once the tag is powered up, the tag communicates with the reader and it sends information about its own identification to the reader. Now the distinction between the prior art, the Carroll reference, and Beagle's invention has to do with how the reader and the tag achieve synchronization, how they join up and are able to communicate successfully with one another. You're using only phase shifting and Beagle's using both phase and frequency shifting, right? That's correct, Your Honor. Why isn't that distinction enough to avoid at least anticipation and maybe obviousness? Well because in the claims on appeal, Your Honor, there is no claim that has those sorts of limitations in them. The distinction that Beagle is raising is on the source of the bit timing clock signal. In Beagle's invention, what happens is when the tag enters the field, the reader sends to the tag, along with the energy, the reader sends a bit timing clock signal. The tag gets the energy, it creates its own clock, and then it uses the embedded bit timing clock signal that it received from the reader to synchronize its own clock internally with that signal so that when it responds back to the reader, it's responding synchronously with the reader's internal clock so the two can communicate effectively. In other words, both sides need to know where the start and ending of each transmitted bit occurs in the information stream. In the Carroll prior art reference, it teaches a slightly different technique. The way Carroll works is the reader is constantly emitting this electromagnetic signal, but it conveys in it no information initially. Instead, what happens is when the tag enters the field and the tag becomes energized, Carroll's tag sends to the reader, in the form of its configuration work, shown in figure 4A of Carroll, a sync block. That sync block is then used by the reader to communicate back to the tag synchronously. So in other words, the bit timing clock signal in the prior art originates in the tag and goes to the reader. That's the distinction between Carroll and the disclosure of Beagle. But Beagle says explicitly the reader is embedding the bit timing clock signal. Yes, Your Honor. What happens in the Carroll prior art reference is that it contemplates more than simply a one-time communication. That's how Beagle's invention works. Beagle's tag enters the field, becomes energized, synchronizes, and then transmits its identification up to the reader, and it's done. Carroll's invention is more complicated. Carroll contemplates a back-and-forth communication that extends beyond the initial back-and-forth, and in fact allows the reader to subsequently write and change information on the tag. In other words, not only does Carroll's reader get information from the tag, but in a subsequent communication, it can put different information back onto that tag. Because those communications occur over and over again, Carroll teaches that not in the first communication, Judge Rader, but in every subsequent communication from the reader to the tag, the reader's command word, which is shown in Figure 4B of Carroll, includes the same sync block that's included in the initial communication from the tag. In other words, in every subsequent communication from Carroll's reader... So it's the tag that is embedding the bit-time-and-clock signal, not the reader. Initially, the tag embeds the first bit-time-and-clock signal, but Carroll's subsequent communications from the reader also embed a bit-time-and-clock signal. That's what you're... Do they embed, or do they simply follow what has already been embedded by the tag? They embed the command word into the outgoing signal, and Beagle admits that. Beagle admits that on page 20 of the Blue Brief, that Carroll embeds a command word into the alternating magnetic field. The only question, then, is whether the sync block in that embedded command word, which is identical to the sync block it received from the tag, whether... That's the four zeros? Four zeros. That's correct, Your Honor. Whether that sync block constitutes a bit-time-and-clock signal, which the Board found, as a matter of fact, that it does. But Beagle insists that the fact that the reader embeds the bit-time-and-clock signal is the distinction. And as for the claims that are here on appeal from Carroll... Well, he's right and wrong about that. First, he's right that it's a distinction between what he has disclosed in his specification and what Carroll teaches. But he's wrong that the claims on appeal require that distinction, Judge Newman. So the concern is the way the claims are written, not the invention that they are presumably covering? Well, under 112's second paragraph, Your Honor, the Patent and Trademark Office takes the claims at face value and assumes that is the invention that's being claimed. Are there other narrower claims? Yes, there are, Judge. For example, Independent Claim 76 specifically recites that the bit-time-and-clock signal used in the communications originates with the reader. Now, in his... He seems to be saying that what's embedded by the reader isn't the bit-time-and-clock signal. Well, yes, he's making the argument, and his argument has shifted somewhat between the blue brief and the gray brief. But essentially, his argument seems to be that the bit-time-and-clock signal, excuse me, the sync block in Carroll's reader cannot function as a bit-time-and-clock signal. And he makes some technical arguments as to why it cannot function as a bit-time-and-clock signal. One of his arguments, I think his dominant argument, is that because it is four consecutive zeros, that four consecutive zeros cannot result in a square wave, like a clock that would go up and down and up and down, because it's just a steady stream of digits. If you're right that the reader is embedding, why don't we have anticipation of 47, 56, and 57? Why do you go to obviousness? Why is it that anticipation? Your Honor, that's because of how the examiner initially rejected the device claims on appeal. There were claims directed to a reader, and there were claims directed to a tag, for example, claim number 47 that's now on appeal. In Carroll's reader and tag, only Carroll's tag has a capacitor that's included in the antenna. The antenna on a tag has an inductor and a capacitor that work together to take the incoming alternating magnetic field and create a current. But the legal brief concedes that Carroll describes a capacitor. Yes, Your Honor, it does. I'm speaking as to why the rejection happens to be a 103 in this case. So the tag in Carroll uses a capacitor and an inductor to sort of tune it to get it to the right frequency, but Carroll's reader doesn't need that capacitor. Now, in making the rejection, what the examiner did in this case is that he lumped together the tag claims and the reader claims as to the requirement that there be a capacitor in them. And he said, observing Carroll's lack of a capacitor in Carroll's reader, that it would be obvious to stick a capacitor in. The problem with that rejection is that it didn't need to get there, is that Carroll's tag does have a capacitor in it. And the Board in their second opinion seemed to miss that distinction. But the claims on appeal, assuming that the Board's analysis is correct. So it could be anticipation? Yes, Your Honor. It could be anticipation. And of course, there's no error, there's no error. And so what would, if in fact they were to change the claims, which all require that or most of them require that the reader embed the bit time and clock signal, to say that is only the reader? And that would then avoid the objection, would it? Certainly it would, Your Honor, provided that the claim recited that the bit time and clock signal originate with the reader. That's what's in one of his dependent claims. And that's what's in the preamble of Claim 71, which is why he's trying so hard to get that claim limited by its preamble, because it is in the preamble, it's not in the body of the claim. But yes, if these claims were amended to recite that the bit time and clock signal originated with the reader, that is synchronization started with the reader, then they would overcome Carroll for the same reasons the Board described in its opinion. Wouldn't it have been easier for the, instead of this elaborate back and forth, plus the appeal and back and forth to the Board, to make that suggestion to the applicant that this is all you have to do, is somehow conform the claims more specifically to the specification? Well presumably the applicant understood that. When one claim is rejected because it lacks a limitation, and that limitation is specifically found in a claim that's allowed, and the fight is over how the rejected claim should be construed, presumably the applicant knows that if he specifically amends his claim to recite that limitation, that too would overcome the priority. The problem in this case, Your Honor, there are 80 claims in this case, and Beagle has been unwilling to amend ever, for any reason, except when it was a technical reason, and he could easily do it. He wants all 80 of his claims. And unfortunately, 6 of the 80 claims, the only 6 that are currently subject to a rejection, are simply too broad. Do you suppose the reason for his reluctance to amend has anything to do with Vesto and his loss of equivalence when he does so? Well it could be. That's usually the reason people avoid amending. Unfortunately, if this is the case, there are many arguments on the record now that I think he would have a hard time going after somebody who didn't have a bit-timing clock signal that originated with the reader. But of course, at the Patent and Trademark Office, as this Court said as recently as last week, we give claims their broadest reasonable interpretation, and that's because the applicant still has an opportunity to amend the claims, produce prosecution history that a district court can later use to figure out what the claims mean. Who prosecuted this application? Was it counsel? He is a patent attorney, yes, Your Honor. He's also one of the named inventors. And he prosecuted it? Yes, he did. So, I get frustrated in these cases where what we end up with on appeal is legal argument from the counsel, which is asking us to know what a bit-timing clock signal is, and whether that's what the reader embedded here or didn't, which seems very much to be a factual issue rather than an issue for legal argument. I don't know why PTO doesn't insist on making a better factual record of these things rather than turning it into a legal argument. I guess that's a matter for another day. Well, Judge Dyke, it's our position that it is a factual issue. It's our position it's a pretty straightforward factual issue. These cases develop iteratively, one step at a time. So, when the Board writes its first decision, it's not necessarily writing a decision on this one point to flush it out for this Court's review. Now, what happened in this case, as I'm sure the Court's aware, is that there were lots and lots of groupings of claims, many rejections, many prior art references, and the Board had its hands full. Well, I guess what I'm saying is if the Board's view is that this is not a bit-timing clock signal that's being embedded, or that it is a bit-timing clock signal that's being embedded and that the applicant is saying the opposite, that the applicant ought to be forced to come in with some sort of evidence or affidavit rather than legal argument as to why that's not true. Well, the applicant has that opportunity. The applicant can also amend his claims. Most They have their own strategy, and all we can do is examine the claims under the statute and the opinions provided by this Court, which is what the Board did in this case, Your Honor. Okay. Any more questions for Mr. Kelly? Any more questions? Okay. Thank you, Mr. Kelly. Thank you again for coming in and talking with us. Thank you very much.